**No. 19-55802**
_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

WALLEN LAWSON,

*Plaintiff-Appellant*,

v.

PPG ARCHITECTURAL FINISHES, INC.

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Central District of California
No. 8:18-cv-00705-AG-JPR
Hon. Andrew J. Guilford

_____

## APPELLANT'S OPENING BRIEF

_____

Patrick Leo McGuigan
plmcguigan@hkm.com
HKM Employment Attorneys LLP
453 S. Spring Street, Suite 1008
Los Angeles, CA 90013
Tel:   (213) 259-9950

Bruce C. Fox
bruce.fox@obermayer.com
Andrew J. Horowitz
andrew.horowitz@obermayer.com
Obermayer Rebmann Maxwell &
Hippel LLP
BNY Mellon Center, Suite 5240
500 Grant Street
Pittsburgh, PA 15219
Tel:   (412) 566-1500

*Attorneys for Appellant*
*Wallen Lawson*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ......................................................................... i

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ........................................................ 4

    **A.** The Basis for the District Court's Jurisdiction ........................... 4

    **B.** The Basis for this Court's Jurisdiction ..................................... 4

    **C.** The Filing Dates Establishing the Timeliness of the Appeal ..... 5

STATUTORY AUTHORITIES ............................................................. 5

ISSUES PRESENTED ....................................................................... 5

STATEMENT OF THE CASE .............................................................. 6

SUMMARY OF THE ARGUMENT ..................................................... 15

ARGUMENT .................................................................................. 16

    I.    Standard of Review ........................................................ 16

    II.    The District Court Erred in Dismissing Lawson's Retaliation and Wrongful Discharge Claims ............................................ 17

    III.    The Correct Substantive Analysis Is Based Upon The Federal AIR-21 Framework, Not *McDonnell Douglas* ................................. 17

    IV.    Cases Applying *McDonnell Douglas* to Section 1102.5 Claims Were Incorrectly Decided And Not Binding On This Court ....................... 24

    V.    Summary Judgment Should Have Been Denied ................................. 25

**A.** Lawson produced substantial evidence that the protected activity was a contributing factor in his firing.........................26

**B.** PPG cannot show by clear and convincing evidence that it would have fired Lawson in the absence of his protected activity....................................................................................32

**C.** The District Court Failed to Construe All Reasonably Disputed Inferences in Favor of Lawson, Weighed the Evidence on Disputed Facts, Improperly Made Credibility Determinations, and Applied an Overly Burdensome Standard in Reviewing Circumstantial Evidence ..........................................................33

    **1.** The District Court's curious standard for evaluation of circumstantial evidence ...................................................33

    **2.** The District Court's weighing of the evidence on disputed facts revealed in oral argument ........................34

    **3.** The District Court's further improper weighing of conflicting evidence and credibility determinations ......37

CONCLUSION ......................................................................................41

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

*Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152 (3d Cir. 2013). ...........22

*Burch v. Regents of the Univ. of Ca.*, 433 F. Supp. 2d 1110, 1129-30 (E.D. Ca. 2006) ...........................................................................................................40

*Butler v. City of Prairie Vill.*, 172 F3d 736, 752 (10th Cir. 1999) .........................31

*Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).............................................23

*Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003)..........................................33

*Despain v. BNSR Ry. Co.*, No. CV-15-08294, 2018 U.S. Dist. LEXIS 95518, at *17 (D. Ariz. Feb. 20, 2018)........................................................................ 22, 31

*Diaz v. Eagle Produce, Ltd.*, 521 F.3d 1201, 1214 (9th Cir. 2008)................. 34, 40

*Dominguez-Curry v. Nelson v. City of Davis,* 571 F.3d 924, 928 (9th Cir. 2009) ..34

*Dominguez-Curry v. Nev. Transp. Dept.*, 424 F.3d 1027, 1037 (9th Cir. 2005).....40

*Evans v. USF Reddaway, Inc.*, No. 1:15-CV-00499-EJL-REB, 2017 U.S. Dist. LEXIS 102510 (D. Idaho June 30, 2017).....................................................19

*Ferretti v. Pfizer, Inc.*, No. 11-CV-04486, 2013 WL 140088, at *10 (N.D. Cal. Jan. 10, 2013) ...............................................................................................24

*Formella v. U.S. Dept. of Labor*, 628 F. 3d 381, 389 (7th Cir. 2010) .....................19

*France v. Johnson*, No. 13-15534, 2015 U.S. App. LEXIS 13487 (9th Cir. Aug. 3, 2015) ..............................................................................................................33

*Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1196 (9th Cir. 2019). ...............................21

*Frost v. BNSF Ry. Co.*, No. CV 15-124-M-DWM, 2017 U.S. Dist. LEXIS 78263 (D. Mont. May 23, 2017)............................................................................20

*Harris v. City of Santa Monica*, 294 P.3d 49 (Cal. 2013) ......................................24

*Hess v. Union Pac. R.R. Co.*, 898 F.3d 852, 858 (8th Cir. 2018)...........................27

*Jensen v. BNSF Ry. Co.*, No. 13-cv-05955, 2015 U.S. Dist. LEXIS 114690, at *3 (N.D. Cal. Aug. 27, 2015). ...........................................................................22

*Marano v. Dep't of Justice*, 2 F.3d 1137, 1141 (Fed. Cir. 1993) ...........................23

*McDonnell Douglas v. Green*, 411 U.S. 792 (1973) ................................17

*Mull for Mull v. Motion Picture Indus. Health Plan*, 865 F.3d 1207, 1209 (9th Cir. 2017). ................................................................16

*Nevada Transp. Dept*, 424 F.3d 1027, 1036 (9th Cir. 2005)...................34

*Noyes v. Kelly Servs.*, 488 F.3d 1163, 1170 (9th Cir. 2007)....................34

*Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004). ............17

*Patten v. Grant Joint Union High Sch. Dist.*, 134 Cal. App. 4th 1378 (Ct. App. 2005). ................................................................24

*Ross v. Campbell Soup Co.*, 237 F3d 701, 708 (6th Cir. 2001)............................31

*Sada v. Robert F. Kennedy Medical Center*, 56 Cal. App. 4th 138, 156 n.21 (Ct. App. 1997) ................................................................26

*Simo v. Union of Needletrades*, 322 F.3d 602, 610 (9th Cir. 2003). .......................17

*Stone & Webster Eng'g Corp. v. Herman*, 115 F.3d 1568, 1572 (11th Cir. 1997) .23

*Suzuki Motor Corp. v. Consumers Union, Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003). ................................................................16

*Tamosaitis v. URS Inc.*, 781 F.3d 468, 481 (9th Cir. 2015) ....................................22

*Thomas v. Union Pac. R.R. Co.*, 203 F. Supp. 3d 1111, 1115 (D. Or. 2016)... 18, 22

*T-Mobile USA Inc. v. Selective Ins. Co. of Am.*, 908 F.3d 581, 586 (9th Cir. 2018) ................................................................24

*Winarto v. Toshiba America Electronics Components, Inc.*, 274 F.3d 1276, 1285-86 (9th Cir 2001) ................................................................30

*Wooten v. BNSF Ry.*, No. CV 16-139, 2018 WL 4462506, 2018 U.S. Dist. LEXIS 159199, at *4 (D. Mont. Sept. 18, 2018)....................................22

**Statutes**

18 U.S.C. § 1514A(b)(2)(C) ................................................................19

28 U.S.C. § 1291 ................................................................4

28 U.S.C. § 1332................................................................4

49 U.S.C. § 20109(d)(2)(A)(i) ................................................................19

49 U.S.C. § 42121(b)(2)(B)(i)-(ii). ............................................................20

Cal. Labor Code §1102.5 ...........................................................................2

Cal. Labor Code § 1102.6 ..........................................................................3

**Rules**

Federal Rule of Civil Procedure 56(c). ....................................................16

# INTRODUCTION

Wally Lawson was employed by PPG as a territory manager and had worked in the paint industry his entire professional career, spanning 35 years, before joining PPG in 2015. Beginning in April 2017, Clarence Moore, the regional manager to whom Lawson reported, conducted a series of weekly conference calls during which he repeatedly instructed his fourteen territory managers, including Lawson, to surreptitiously "mis-tint" gallons of PPG's "Rescue It" paint when Lowe's employees were not looking or out on a break.[1]

Appalled at Moore's directive, Lawson called Moore and told him he would not participate in the mis-tinting because it was wrong, and told Moore he believed his instructions to mis-tint constituted a directive to steal from Lowe's. Lawson also reported Moore's misconduct to PPG's online portal for reporting ethics violations and had interaction with PPG's internal investigator about it. Not long thereafter, Moore placed Lawson on a Performance Improvement Plan ("PIP), allegedly for not meeting sales quota. PPG, however, did not have a strict sales quota for territory managers, and certainly no policy requiring placement on a PIP for failure to meet it.

---

[1] This brand of paint was a slow selling product, and PPG would have had to repurchase unsold product back from Lowe's. However, if a gallon of paint was mis-tinted, it was considered sold to Lowe's.

PPG conducted a full-scale corporate investigation into Lawson's complaint about mis-tinting. The investigation revealed a larger scheme of mis-tinting that involved other management level employees like Moore. As a result, Moore was instructed to text all his territory managers directing them to stop the mis-tinting immediately. Meanwhile, Moore gave Lawson artificially low scores on Lawson's subsequent "market walks," an evaluation tool used to monitor performance of territory managers, and placed him (for the first time in his 37 year career) on a performance improvement plan. Moore then fired Lawson with the blessing of PPG management a few weeks after the investigation into the mis-tinting scheme. There is ample evidence in this case that Moore's stated reasons for firing Lawson were wholly contrived, and that in reality, PPG and Moore fired him for reporting a fraudulent and illegal scheme which they wanted to keep secret.[2]

The District Court erred in granting PPG's motion for summary judgment, because it applied the incorrect legal standard to Lawson's claim of whistleblower retaliation under Labor Code §1102.5 and his claim for wrongful termination in violation of public policy premised on a violation of §1102.5. The District Court erroneously applied the *McDonnell Douglas* standard. This is an entirely different and much more lenient evidentiary standard than that mandated by statute in

---

[2] The results of the investigation and the fraud, however, were never reported to Lowe's, nor was it ever issued a credit attributable to the inventory fraud carried out by Moore and his cohorts. Moore never received any actual discipline and remains at PPG to this day.

Section 1102.6, which provides the standard of proof for section 1102.5 claims. Section 1102.6 requires that the employer *disprove* retaliation by "clear and convincing" evidence once the employee has presented a prima facie case suggesting that the protected activity was a merely a "contributing factor" in the termination decision. Lawson's refusal to participate in illegal conduct, his complaint to his manager Clarence Moore regarding his opposition to his illegal directive, and his complaint to PPG's internal ethics hotline, all constituted protected activities under Section 1102.5.

In order to survive summary judgment, Lawson needed only to show evidence that the protected activity, individually or collectively, was a "contributing factor" in the adverse employment action taken against him. Given that Lawson's complaint exposed a much bigger scheme within PPG, that Moore placed Lawson on a PIP and then terminated him after Moore was investigated for his role in the scheme, and the close temporal proximity of these events, the record at the summary judgment stage amply supported a finding that Lawson met his initial burden of showing that his protected activity was a contributing factor in his termination. The burden would then have shifted to PPG to show by clear and convincing evidence that PPG would have taken the same action against Lawson even if Lawson had not opposed or complained of Moore's directive to mis-tint. The District Court did not require PPG to meet these stringent requirements,

requiring it only to show by a preponderance of the evidence a legitimate, non-discriminatory reason for the firing.

The District Court compounded its error by failing to draw all reasonable inferences in favor of Lawson, weighing the evidence, and improperly making credibility determinations. In granting summary judgment, the District Court relied most heavily upon testimony by Clarence Moore and evidence generated by him—a witness whose credibility is greatly in doubt. The District Court's decision must be reversed.

## JURISDICTIONAL STATEMENT

### A. The Basis for the District Court's Jurisdiction

The District Court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeded the jurisdictional threshold.

### B. The Basis for this Court's Jurisdiction

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. The District Court granted PPG's motion for summary judgment on all claims alleged in the complaint and entered a final judgment in favor of PPG. (ER18-20).

**C.    The Filing Dates Establishing the Timeliness of the Appeal**

The District Court issued the judgment  on June 26, 2019. (ER18). The notice of appeal was filed 16 days later on July 12, 2019. (ER15).

## STATUTORY AUTHORITIES

All relevant statutory authorities appear in the Addendum to this brief.

## ISSUES PRESENTED

I.    Whether the District Court erred in applying the incorrect legal standards in dismissing Lawson's claims for retaliation under California Labor Code § 1102.5 and for wrongful termination as a matter of public policy when Lawson produced sufficient evidence from which a reasonable jury could believe that his protected activity was a contributing factor in his termination, and PPG failed to prove by clear and convincing evidence that Lawson would not have been terminated in the absence of his protected activity

II.    Whether the District Court erred in applying erroneous standards for evaluation of circumstantial evidence, weighing the evidence, making credibility determinations, and failing to draw all reasonable factual inferences in Lawson's favor in granting summary judgment.

## STATEMENT OF THE CASE

*Lawson's early experience at PPG*

PPG hired Wally Lawson as a territory manager in May 2015. (ER82). As territory manager at PPG, Lawson's job duties primarily involved merchandizing PPG paint products in Lowe's home improvement stores, ensuring that PPG displays at Lowe's were stocked and in good condition and that Lowe's associates were trained on PPG products. (ER82). Lawson initially reported to regional manager Paul Stanton. In October 2016, Lawson had his first market walk, a performance evaluation tool at PPG where employees are scored on various criteria while shadowed by their supervisor during their visit to the Lowe's store. Lawson received 92 out of 100 available points from Stanton. (ER542). Notably, Lawson was recognized for having the highest market walk score in the country (out of some 210 territory managers), and was awarded a pay raise and a gift card. (ER263). He also received a congratulatory call from Sean Kacsir, the divisional manager overseeing all of the regional managers in the western half of the United States. (ER263).

Sometime at the end of 2016 and beginning of 2017, Clarence Moore became Lawson's new supervisor. (ER253-54). In December 2016, Moore conducted a market walk with Lawson for the first time and gave him a score of 60 out of 100, which was considered "marginal" (ER547). On March 2, 2017,

however, Lawson received a positive annual review from Moore with a rating of "successful." (ER98-99). Lawson had another market walk with Moore on or about March 15, 2017, in which he was given similar "unsuccessful" score of 58. (ER550-56). Although these two market walk scores were greatly reduced from those Lawson had received from his previous supervisor and it is evident that Moore was "a low grader," no evidence was presented by PPG that the scores put Lawson's job in jeopardy.

***Lawson's opposition to and reporting of Moore's unethical directive***

On April 18, 2017, Moore held a conference call with the fourteen territory managers under his supervision, including Lawson, during which Moore instructed the territory managers to surreptitiously "mis-tint" on every store visit (who visited Lowe's stores five days per week) a few gallons of a PPG paint product called "Rescue It" at each of the Lowe's stores. [3] Moore told them to do it "on the down-low" while no one from Lowe's was watching. (ER115-18). Moore was under pressure from his manager, Sean Kacsir, to sell off the "Rescue It" paint in order to free up shelf space at Lowe's stores for other PPG products. (ER133). The mis-tinted paint would then be placed on an "oops" rack next to the paint desk and sold

---

[3] Like most paint, the product is shipped from the factory as a neutral base formula without pigment, and then tinted to the customer's requested color at the Lowe's paint desk using a machine that mixes pigments into the base formula. (ER83, ¶8). While Lowe's associates typically operate the tinting machine, territory managers would frequently cover the paint desk while the Lowe's associates were at lunch or on break. *Id.*

at a deep discount. (ER 3). It is undisputed that Moore's mis-tinting directive to his territory managers violated PPG's Global Code of Ethics. (ER142). After the initial instruction, Moore repeated it in at least two subsequent weekly conference calls with his territory managers. (ER132). During those calls, some territory managers bragged about the amount of paint they mis-tinted. *Id.*

Lawson realized that Moore's scheme was illegal and unethical. (ER293-94). After conferring with his daughter, an HR specialist, on April 18, 2017, three days after the conference call, Lawson promptly reported Moore's unethical directive to the company's confidential online portal for reporting internal ethical violations on April 21, 2017. (ER293-94). Soon thereafter, Lawson spoke by phone with Moore and expressed his belief that the mis-tinting practice was wrong and that there was "no way" he was going to participate in it. (ER119-21, ER125-26). During this conversation with Moore, Lawson also related an anecdote about how Lawson had confronted an employee at his former job about using a company postage meter for personal mail, as he considered it stealing. (ER119-20). In his conversation with Moore, Lawson further made reference to John Dean and his historical role in Watergate and explained how it was applicable to the current situation. (ER125-26). In that context, Lawson told Moore that the truth mattered. *Id.* Moore at that point became agitated and told Lawson not to "concern himself"

with the issue, which Lawson interpreted to mean that his remarks were not well-received. (ER129-30).

### *Moore's placement of Lawson on a performance improvement plan and Lawson's resubmission of his report*

Just a couple of weeks later, on May 12, 2017, Moore placed Lawson on a performance improvement plan ("PIP"). (ER349). Once an employee is put on a PIP, PPG's standard practice was for the employee's supervisor to meet that employee on a weekly basis to help improve their performance. (ER523). However, Moore did not have any one-on-one meetings with Lawson for over a month following the implementation of Lawson's PIP. (ER523).

After waiting several weeks for a response to his report to the ethics portal and not having received it, on June 15, 2017, Lawson telephoned PPG's ethics reporting hotline to resubmit his report of wrongdoing by Moore. (ER296-98; ER354). On June 26, 2017, PPG's compliance department contacted Lawson though the ethics reporting online portal and asked if he would speak with David Duffy, PPG's Senior Manager of Investigations and Corporate Security. (ER146). Lawson agreed and provided his personal cell phone number. (ER146). Duffy called Lawson on June 28, 2017, and left a voicemail asking Lawson to call back. (ER102). In doing so, Duffy heard Lawson's voicemail greeting, which stated: "Hi, this is Wally Lawson. I'm not available, please leave a brief message and I'll get

back to you as soon as I can." (ER107). Lawson's identity therefore became known to Duffy.

***PPG's launch of a national investigation of inventory fraud at Lowe's***

As a direct consequence of Lawson's report, PPG subsequently launched a national investigation into the practice which revealed that it was widespread. (ER37). Following Lawson's second report to PPG, Duffy assigned John "Ian" Dalton to interview Moore and the other territory managers whom Moore supervised. (ER212). Dalton interviewed all fourteen of Moore's territory managers, who uniformly confirmed that Moore ordered the mis-tinting. (ER132-33). Duffy and Dalton thereupon issued a report finding that Moore was guilty of orchestrating the mis-tinting scheme. (ER151-52). Dalton also directed Moore to discontinue the practice. Moore then sent his territory managers a text message: "*Effective immediately!!!! Please do not mis-tint Rescue It product any more*." (ER154, ER 215)(emphasis added). At the instruction of Dalton, Moore prepared a statement regarding his role in the mis-tinting for the investigative file. (ER148-49, ER216). In his statement, Moore remarkably continued to deny his active role in orchestrating the inventory fraud, falsely claiming that one of his territory managers suggested it on the conference call and that he had only "failed to stop it." (ER148-49). However, PPG's investigation revealed that Moore did in fact order his subordinates to mis-tint "on the down low." (ER33-34).

Around this time, Dalton also received a report from another territory manager in Texas that her regional manager, Brian Wells, had similarly directed her to mis-tint paint. (ER146, ER156-57, ER160). Consequently, Duffy and Dalton expanded the scope of the investigation and enlisted Kacsir to assist. *Id.* During the course of discovery, Lawson learned that a third regional manager under Kacsir, David Larson, ordered his territory managers to mis-tint paint. (ER146, ER156-57, ER160).

### Moore's retaliatory market walks with Lawson

On July 13, 2017, one week after Dalton interviewed Moore about his mis-tinting directive, Moore traveled to Los Angeles to do a market walk with Lawson and scored him 66 out of 100, another marginal rating. (ER338). During the July 13 market walk, Moore also observed that the training roster software on Lawson's company-issued iPad was malfunctioning, prompting Moore to send an email to PPG's IT department. (ER189). A training roster lists Lowe's paint department employees in each Lowe's store and tracks when the PPG territory manager assigned to the store  has trained the paint employees on subjects related to PPG products. (ER176). Because Lowe's employees can have high turnover, territory managers have to frequently re-train at a given store and update their rosters accordingly. (ER175).

Moore conducted a final market walk with Lawson on August 16, 2017, this time accompanied by Sean Kacsir. (ER261). Moore scored Lawson 40 out of 100 points, an egregious score that was far lower that all previous market walk scores by Moore, and less than half of the score that Lawson had received from his prior supervisor. (ER342). Moore cited discrepancies in Lawson's training roster as part of the justification for the low score. (ER198-206, ER346-47). Moore never investigated the possibility, as was actually the case, that the discrepancies were caused by Lawson's tablet malfunctioning, and Lawson being forced to reconstruct the training events without any intention to deceive. (ER182).

Moore also acted as though he was not conscious of mitigating factors relating to Lawson's performance of which he was demonstrably aware. (ER77-78). Most importantly, Moore reassigned Lawson three underperforming stores including one that was eventually closed, and also removed two high-performing stores from Lawson. (ER78-79). This of course greatly affected Lawson's sales metrics, and Moore opportunistically used the resultant lowered sales numbers as justification for his PIP and firing. (ER79).

Moore's reasons for firing Lawson also shifted throughout the course of events, which suggests that it knew its reasons were not genuine and would not withstand scrutiny. Moore claimed that he put Lawson on the PIP because of his sales numbers, telling Lawson that he was required by PPG policy to place Moore

on a PIP under such circumstances. (ER79). Andy Mayhew, Lawson's HR Manager, however, confirmed that there was no such policy. *Id.* Next, Moore shifted the focus to Lawson's market walk scores and proceeded to give Lawson an unfairly low score to justify firing him. After Lawson complained to Andy Mayhew, PPG's HR Manager, that Moore was not administering his PIP or market walks fairly, Moore again shifted focus to the alleged falsification of Lawson's training roster—despite having no evidence that the errors in Lawson's training roster were caused by intentional falsification, rather than unintentional errors ultimately caused by problems with Lawson's iPad. (ER280-82).

### Moore's retaliatory firing of Lawson

On August 21, 2017, Moore and Kacsir asked Andy Mayhew to approve the firing of Lawson. (ER519). Moore forwarded the request to his supervisor, Michele Minda, Director of HR for PPG. (ER197-98). Minda failed to take steps to exercise any oversight surrounding Moore's firing of Lawson. *Id.* Nor did she do what any reasonable HR officer would have done, and put Lawson under a different supervisor for the duration of his Performance Improvement Plan. *Id.* On September 6, 2017, with PPG approval, Moore fired Lawson at a meeting in a hotel conference room. (ER84, ER198, ER346-47). Mayhew participated in the termination meeting by telephone. (ER198). At the meeting, Lawson asked Moore and Mayhew why he was being fired, and Mayhew contended that Lawson had

falsified his training roster and failed his PIP, saying nothing about the proverbial elephant in the room—the fact that Lawson had reported the fraudulent mis-tinting scheme and had confronted him about it. (ER201). Lawson strenuously objected, and began to explain that any discrepancies in his training roster were ultimately due to performance problems with his company-supplied iPad, of which Moore was well aware. (ER279-80, ER346).  Moore cut Lawson short,  stating that it was of no consequence, as Lawson was going to be terminated regardless. (ER347). Lawson then said, "If anyone should be fired, it should be you [meaning Moore] because you stole from Lowe's, our valued customer." *Id.* Mayhew, however, refused to even discuss Moore's misconduct, and then exclaimed, "This meeting is over, I'm hanging up now." The meeting was then concluded. *Id.*

***PPG's concealment of the fraud from Lowe's and protection of Moore***

PPG never told Lowe's that it had conducted a national investigation of allegations that PPG employees had committed inventory fraud against Lowe's and never offered to make restitution for the fraud. (ER163).

After the fraud inquiry was completed, Minda gave Moore an elliptical "warning" that stopped short of stating that he ordered his territory managers to mis-tint paint. (ER165-66). Lowe's dropped PPG paint a few weeks later, and ended its relationship with Defendant. (ER538). At that time, virtually all of the Lowe's merchandising team at PPG was laid off. (ER172). Moore, however, was

promptly rehired by PPG and transitioned into a new role managing a PPG paint store in the Phoenix, Arizona area. *Id*. David Duffy, the lead investigator of the mis-tinting scam, testified that he found it "ironic" that Moore was retained, while his whistleblower, Lawson, had been fired. (ER 186). Remarkably, Duffy testified that he thought that Moore should have been the one fired. (ER 187).

## SUMMARY OF THE ARGUMENT

The District Court erred when it relied upon the *McDonnell Douglas* test to dismiss Lawson's retaliation claim and ignored the essential elements for proving such claims under California Labor Code § 1102.5. Retaliation claims brought under § 1102.5 require only that a plaintiff show that his protected activity was "a contributing factor" in the adverse employment decision, not the sole or even predominant cause, and then the employer must prove by "clear and convincing evidence" that it would have taken the same action in the absence of the protected behavior. The District Court ignored these fundamental requirements and failed to apply the correct substantive analysis. Even if the *McDonnell Douglas* test were appropriate to decide a California Labor Code retaliation claim—which it is not— the District Court compounded it error by applying incorrect standards for evaluation of Lawson's circumstantial evidence, failed to draw reasonable inferences in Lawson's favor, implicitly made credibility determinations, and

ignored or was dismissive of evidence submitted by Lawson sufficient to survive summary judgment even under *McDonnell Douglas*.

## ARGUMENT

### I.    Standard of Review

This Court should reverse the entry of summary judgment because Lawson demonstrated that he engaged in protected activity, and that there were, at the very least, material issues of fact as to: a). whether his protected activity was a contributing factor in his termination, and b). whether PPG would have terminated him absent the protected activity. Because the District Court granted PPG's motion for summary judgment and dismissed the case in its entirety, the controlling standard of review for the errors made by the District Court in granting summary judgment is *de novo. See Mull for Mull v. Motion Picture Indus. Health Plan*, 865 F.3d 1207, 1209 (9th Cir. 2017). This Court's review is governed by the same standard as the trial court under Federal Rule of Civil Procedure 56(c). *Suzuki Motor Corp. v. Consumers Union, Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003). Under this standard, the decision below should be reversed because the District Court applied the incorrect substantive law. Had it applied the correct substantive law, it would have determined that genuine issues of material fact exist when the evidence is viewed in the light most favorable to Lawson. *See id.*; *Olsen v. Idaho*

*State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004). Accordingly, this Court should reverse the District Court and remand for further proceedings.

## II. The District Court Erred in Dismissing Lawson's Retaliation and Wrongful Discharge Claims

In granting PPG's motion for summary judgment on Lawson's retaliation and wrongful discharge claims, the District Court committed two reversible errors: first, it applied the *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) analysis, which is not the correct analysis for a Labor Code § 1102.5 retaliation claim; and then, it analyzed Lawson's circumstantial evidence using incorrect evidentiary standards, failed to draw reasonable inferences in Lawson's favor, implicitly made credibility determinations, and ignored or was dismissive of evidence submitted by Lawson. Because Lawson has produced sufficient evidence of retaliation under§ 1102.5, either error is alone sufficient to require a reversal of the District Court's decision and a remand.

## III. The Correct Substantive Analysis Is Based Upon The Federal AIR-21 Framework, Not *McDonnell Douglas*

The District Court analyzed Lawson's whistleblower retaliation claim using the *McDonnell Douglas* standard applied in employment discrimination cases. (ER5). Lawson's retaliation claim, however, was brought under California Labor Code § 1102.5. (ER571). The methodology for proving claims under Section

1102.5 is set forth in California Labor Code § 1102.6, and is entirely different from

the *McDonnell Douglas* analysis:

> In a civil action or administrative proceeding brought pursuant to Section 1102.5, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5.

Cal. Labor Code § 1102.6.

There are four critical differences between the *McDonnell Douglas* test and

the requirements of § 1102.6 that demonstrate the impropriety of the District

Court's misapplication of the former. First, § 1102.6 places the burden of proof on

the employer to show not only that there was a legitimate, nondiscriminatory

reason for the termination, but that the same decision would have been made even

in the absence of protected activity. *McDonnell Douglas* imposes no such

requirement on the employer. Second, § 1102.6 requires that the employer prove

that it would have terminated the employee in the absence of protected activity by

clear and convincing evidence. M*cDonnell Douglas*, by contrast imposes no

burden of proof on the employer. *See Thomas v. Union Pac. R.R. Co.*, 203 F. Supp.

3d 1111, 1116 (D. Or. 2016) ("The clear and convincing standard is a higher

burden of proof than used in many other employment discrimination and retaliation

statutes"). Third, under § 1102.6 the employee need only show that the protected

activity was a "contributing factor" in the retaliatory discharge, not the sole or even predominant cause. Finally, the *McDonnell Douglas* test shifts the burden back to the plaintiff once the employer produces evidence of a legitimate, nondiscriminatory reason; the plain language of § 1102.6 contains no such subsequent burden-shift back to the plaintiff. These four critical differences demonstrate that § 1102.6 is much more favorable to the complaining employee than *McDonnell Douglas*. *See Formella v. U.S. Dept. of Labor*, 628 F. 3d 381, 389 (7th Cir. 2010) (applying AIR-21's framework to whistleblower retaliation claim under the Surface Transportation Assistance Act, which contains identical burdens to those of § 1102.5); *Evans v. USF Reddaway, Inc.*, No. 1:15-CV-00499-EJL-REB, 2017 U.S. Dist. LEXIS 102510, at *10 (D. Idaho June 30, 2017) (same). The "causation" element of Lawson's prima facie case is much less onerous under this framework, and the burden on PPG to show it would have taken the same action anyway is by clear and convincing evidence, a substantially higher burden on proof than required under *McDonnell Douglas*.

Other federal statutes follow a burden of proof standard nearly identical to the standard set forth in Section 1102.6, including the whistleblower protections of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A(b)(2)(C), on which Section 1102.5 is modeled, and the retaliation provisions of the Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20109(d)(2)(A)(i). Both of those statutes incorporate the burden of

proof set forth in the whistleblower protections of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21"), which requires the plaintiff to make a *prima facie* showing that the protected activity was a contributing factor in the adverse employment decision, after which the employer must show by clear and convincing evidence that it would have made the same decision without the protected activity. *See* 49 U.S.C. § 42121(b)(2)(B)(i)-(ii). Because § 1102.5 was enacted to mirror the federal Sarbanes Oxley law, the case law interpreting these federal statutes is also instructive in this case.

In *Frost v. BNSF Ry. Co.*, No. CV 15-124-M-DWM, 2017 U.S. Dist. LEXIS 78263 (D. Mont. May 23, 2017), the trial court instructed the jury that it could hold the defendant not liable if it concludes that the defendant terminated the plaintiff's employment based on its "honestly held belief that the plaintiff engaged in the conduct for which he was disciplined." The plaintiff Frost argued that this instruction was improper because the "honest belief" instruction was applicable to *McDonnell Douglas* burden shifting, not to the standard applicable to his Federal Rail Safety Act claim, the elements of which are the same as §1102.5. The district court found that the honest belief instruction was not incompatible with the defendant's burden to prove by clear and convincing evidence that it would have fired Frost even if he had not engaged in protected activity. *Id.* On appeal, the Ninth Circuit reversed. The Ninth Circuit reasoned that under the applicable

standard, "plaintiffs satisfy that burden by proving that their protected activity was a contributing factor to the adverse employment decision. There is no requirement, at either the prima facie stage or the substantive stage, that a plaintiff make any additional showing of discriminatory intent." *Frost v. BNSF Ry. Co*., 914 F.3d 1189, 1196 (9th Cir. 2019). The district court's honest belief instruction was incompatible with this standard, because it would encourage the jury to focus on whether the employer's reason was sufficient to justify the termination, not whether Frost's protected activity was a contributing factor. *Id*., at 1197. The Ninth Circuit further reasoned that under the correct standard, "'contributing factors' may be quite modest—they include 'any factor' which 'tends to affect in any way the outcome of the decision,'" and Frost would therefore be entitled to relief even if his protected activity played "only a very small role" in the decision-making process. *Id*. at 1197. The District Court in this case failed to apply the correct standard for causation enunciated by this Court in *Frost*. Its failure to do so constitutes reversible error, as Lawson has presented more than sufficient evidence from which a jury could reasonably infer that his reporting of and objection to Moore's mis-tinting scheme affected "in any way" the decision by Moore and others at PPG to fire him.

The District Court's error is further illustrated by the opinion of the Third Circuit in *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152 (3d Cir.

2013).[4] In *Araujo*, the district court granted summary judgment in favor of an employer and dismissed the plaintiff's retaliation claims under the FRSA. *See id.* at 156. In reversing the district court, the Third Circuit noted that the *McDonnell Douglas* test is only used where the applicable statute does not provide for a burden-shifting analysis. *Id.* at 157. However, because the FRSA specifically incorporated the AIR-21 burden-shifting framework, that framework was the appropriate approach to analyze the plaintiff's case, not that of *McDonnell Douglas. Id.* at 158. The *Araujo* decision not only holds that *McDonnell Douglas* is inapplicable in cases such as this involving an AIR-21 framework, but it also demonstrates why *McDonnell Douglas* is incompatible with the requirements of § 1102.6. First, both AIR-21 and § 1102.6 require only that the employee demonstrate that the protected activity was "a contributing factor" in the company's adverse employment decision. As the *Araujo* court explained, the employee "*need not* demonstrate the existence of a retaliatory motive … in order to establish that his disclosure was a contributing factor to the personnel action." *Id.*

---

[4] *Araujo* has been either followed or cited favorably throughout the Ninth Circuit. *See*, *e.g.*, *Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1196 n.5 (9th Cir. 2019); *Tamosaitis v. URS Inc.*, 781 F.3d 468, 481 (9th Cir. 2015); *Wooten v. BNSF Ry.*, No. CV 16-139, 2018 WL 4462506, 2018 U.S. Dist. LEXIS 159199, at *4 (D. Mont. Sept. 18, 2018); *Despain v. BNSR Ry. Co.*, No. CV-15-08294, 2018 U.S. Dist. LEXIS 95518, at *17 (D. Ariz. Feb. 20, 2018); *Evans v. USF Reddaway, Inc.*, No. 1:15-cv-00499, 2017 WL 2837136, 2017 U.S. Dist. LEXIS 102510, at *11 (D. Idaho Jun. 30, 2017); *Thomas v. Union Pac. R.R. Co.*, 203 F. Supp. 3d 1111, 1115 (D. Or. 2016); *Jensen v. BNSF Ry. Co.*, No. 13-cv-05955, 2015 U.S. Dist. LEXIS 114690, at *3 (N.D. Cal. Aug. 27, 2015).

at 158 (quoting *Marano v. Dep't of Justice*, 2 F.3d 1137, 1141 (Fed. Cir. 1993)). The *McDonnell Douglas* analysis is inconsistent with this requirement because it compels an employee to produce evidence of pretext in order to rebut the employer's legitimate, nondiscriminatory reason. No such evidence of pretext is required under § 1102.6. As the Third Circuit noted in *Araujo*, "the AIR-21 burden-shifting framework that is applicable to FRSA cases is much easier for a plaintiff to satisfy than the *McDonnell Douglas* standard." *Id.* at 159.

The requirement that employers demonstrate, "by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior" means that the employer "must show that 'the truth of its factional contentions are highly probable.'" *Id.* (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)). As the *Araujo* court stated, "[f]or employers, this is a tough standard, and not by accident." *Id.* (quoting *Stone & Webster Eng'g Corp. v. Herman*, 115 F.3d 1568, 1572 (11th Cir. 1997)). The *Araujo* court further noted that the outcome on summary judgment might have been different had it used a *McDonnell Douglas* standard because of the "steep burden that employers face under the AIR-21 burden-shifting framework." *Id.* at 162. The same is true in this case.

**IV.** **Cases Applying *McDonnell Douglas* to Section 1102.5 Claims Were Incorrectly Decided And Not Binding On This Court**

Any cases that have applied the *McDonnell Douglas* analysis to retaliation claims under Section 1102.5 were incorrectly decided because that analysis does conflicts with the evidentiary standards mandated by § 1102.6. *See, e.g.*, *Ferretti v. Pfizer, Inc.*, No. 11-CV-04486, 2013 WL 140088, at *10 (N.D. Cal. Jan. 10, 2013) (cited by District Court at ER5); *Patten v. Grant Joint Union High Sch. Dist.*, 134 Cal. App. 4th 1378 (Ct. App. 2005). This Court is also not required to follow those cases because the California Supreme Court has not adopted such a position, and there is persuasive data showing that the California Supreme Court would hold otherwise. *Cf. T-Mobile USA Inc. v. Selective Ins. Co. of Am.*, 908 F.3d 581, 586 (9th Cir. 2018) ("An intermediate state appellate court decision is a 'datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'")

The California Supreme Court's decision in *Harris v. City of Santa Monica*, 294 P.3d 49 (Cal. 2013) clearly demonstrates that California would apply the AIR-21 standard to claims under Section 1102.5 instead of *McDonnell Douglas*. In *Harris*, an employment discrimination case brought under the California Fair Employment and Housing Act, the California Supreme Court held that a *McDonnell Douglas* analysis is inappropriate whenever liability could be found

based upon a combination of legitimate and discriminatory reasons. *See id.* at 54. Because Section 1102.5 requires only that a retaliatory motive be a *contributing* factor in the adverse employment decision, *McDonnell Douglas* cannot be used in such cases. In addition, the *Harris* court also noted that because of the similarity of the federal employment discrimination laws to California's state employment discrimination laws, California follows the relevant federal precedent when applying its own statutes. *Id.* at 56. Because Section 1102.6 mirrors the AIR-21 and Sarbanes-Oxley burden-shifting framework, California would follow the federal precedent on the correct analysis for retaliation claims under Section 1102.5.

## V.     Summary Judgment Should Have Been Denied

Given the strong evidentiary burden that PPG had to overcome, combined with the circumstantial evidence of retaliation that Lawson produced, the District Court should have denied PPG's motion for summary judgment. Lawson has met his initial burden of demonstrating that his complaints were a contributing factor in the adverse employment action under Section 1102.5, which was acknowledged by the District Court. (ER6). Because PPG has failed to produce clear and convincing evidence that it would have fired Lawson in the absence of the protected activity, the District Court's decision should be reversed.

**A.  Lawson produced substantial evidence that the protected activity was a contributing factor in his firing.**

Under the first part of the AIR-21 framework, Lawson must show that (1) he engaged in protected activity; (2) that PPG had knowledge that Lawson had engaged in the protected activity; (3) Lawson suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action. *See Araujo*, 708 F.3d at 157. Factors (1) and (3) are undisputed: Lawson reported Moore's unethical mis-tinting instruction to PPG (ER35), and he was later fired (ER41). The District Court correctly found significant evidence supporting factor (2), holding that "a jury trial is required to determine whether RSM Moore knew Plaintiff was responsible for the mis-tinting allegations."[5] (ER7).  The sole remaining factor (4)—is easily established by the evidence produced by Lawson in

---

[5] It should be noted, however, that it is not necessary for Lawson to demonstrate that Moore "suspected" or "knew" that Lawson was the "reporter." Rather, Lawson just had to complain to Moore about his unlawful instruction to mis-tint. Lawson in fact objected vociferously to the mis-tinting, equating it with stealing, and told Moore that it was unethical and there was "no way" he would do it. (ER119-21, ER125-27, ER129-30). (ER119-21, ER125-27, ER129-30). Even if there had been no report by Lawson to the ethics hotline, this conversation is sufficient engagement in protected activity and the employer's knowledge that he engaged in protected activity. The fact that Moore almost certainly deduced that Lawson was the reporter is merely an additional fact demonstrating that this factor was satisfied. Moreover, the factor is independently satisfied by Duffy's knowledge of Lawson's identity as the reporter. Lawson provided his personal cell phone number in response to a request from Duffy, who then left a voicemail, which resulted in Duffy hearing Lawson's name on his voicemail greeting. (ER102-03, ER107). This evidence is sufficient in and of itself to satisfy factor (2), even if Lawson had never complained to Moore. *Sada v. Robert F. Kennedy Medical Center*, 56 Cal. App. 4th 138, 156 n.21 (Ct. App. 1997).

the summary judgment proceedings below and creates a triable issue of fact.

Circumstantial evidence abundantly demonstrates that Lawson's protected activity was, at the very least, a contributing factor in PPG's decision to fire him. A contributing factor can be shown through either "the temporal proximity between the protected activity and the adverse action" or "indications of pretext such as inconsistent application of policies and shifting explanations." *See Hess v. Union Pac. R.R. Co.*, 898 F.3d 852, 858 (8th Cir. 2018). This standard is met in this case because not only did Moore take disciplinary action against Lawson by placing him on a PIP soon after his protected activity, Moore took additional steps to subvert that disciplinary process once it was initiated in order to ensure that Lawson would lose his job. Accordingly, even though PPG may claim that it had a legitimate reason to fire Lawson, Moore's subversion of the disciplinary process was a contributing factor in that decision.

PPG's main rationale for firing Lawson—that he did not successfully complete his PIP—follows directly from Moore's decision to place Lawson on a PIP in the first place, something that did not occur until shortly after Lawson's protected activity. In fact, Moore placed Lawson on a PIP less than three weeks after Lawson made his first report about mis-tinting and confronted Moore about it. (ER349).

After the PIP was in place, Moore took additional retaliatory steps against Lawson in order to ensure his termination. First, Moore intentionally withheld assistance from Lawson in contradiction of PPG policy, which required managers to meet weekly with their employees during a PIP. (ER523). Based upon the sharp decline in his October 2016 and December 2016 market walk scores, it was apparent that Moore evaluated Lawson much differently than his prior supervisor and that he needed coaching from Moore in order to meet the new standards being applied. (ER33, ER39, ER263). Without that coaching, Lawson would surely have a difficult time successfully completing the requirements under the PIP.

Next, Moore intentionally gave Lawson a much lower score than he was entitled to during his July 2017 market walk, which resulted in a substandard score. (ER180). Moore's low score stood in stark contrast to Lawson's market walk score with his previous supervisor of 92, which was the highest market walk score at the time for all the territory managers in the country. (ER263). A passing score was required for Lawson to complete his PIP successfully. (ER350). Several categories in the market walk assessment allowed for a range of scores. However, instead of giving Lawson even minimal credit, Moore gave him a zero on several of these categories. (ER336-38). The training roster score was particularly irregular. At the time of this market walk, the training roster software on Lawson's company-issued tablet was malfunctioning, a fact that was personally witnessed by Moore.

(ER189). On the market walk report, Moore noted that Lawson missed two associates on his training roster and gave Lawson zero out of a potential four points, despite the malfunctioning software. (ER338). Because Lawson scored a 66 on the July 2017 market walk, partial credit on some or all of the categories where it was available could have given him a successful score of 70. Therefore, by failing to give partial credit and artificially lowering Lawson's market walk score, Moore ensured that Lawson would eventually be fired from PPG.

Moore's biased market walk scoring became even worse in Lawson's final market walk in August 2017. This time, Moore was joined by his supervisor, Sean Kacsir. (ER261). Kacsir had three regional managers under his command, including Moore, each of whom had instructed employees to mis-tint paint, thus suggesting that Kacsir may have been involved in the scheme. (ER146, ER156-57, ER160).[6] Just as with the July market walk, during the August market walk, Moore gave Lawson zero points in several categories where Lawson should have earned at least partial credit. Given his previous failure to assist Lawson during his PIP and his pattern of artificially lowering market walk scores for Lawson, at the very least it is a question of fact whether the unusually low score of 40 that Moore gave during the final market walk was due to Lawson's refusal to participate in the mis-tinting scheme, confronting Moore about the impropriety of it, and Lawson's

---

[6] Kacsir and Moore were close; the two of them socialized around activities like football, drinking, and Topgolf. (ER209-10).

report of Moore's unethical directive to the internal ethics reporting portal and hotline.

There were also numerous inconsistencies in the way Moore evaluated Lawson on this market walk that are suggestive of retaliation. For example, Moore gave Lawson zero points for Liquid Nails placements even though he had more product placements than required, demonstrating that he had prevailed upon Lowe's managers to give him extra space in the stores—something that is a goal for territory managers and demonstrates good relationships with store management. (ER255-57). Moore similarly docked Lawson by five points by having one force-out during the ninety-day period applicable to the market walk, despite PPG's policy of deducting points only if a territory manager has more than one force out. (ER341). These are exactly the types of arbitrary departures from policy by a decision-maker that a jury could reasonably find to be pretext for retaliation. (ER180).

Furthermore, it is anomolous that Lawson's market walk score declined from 92 to 40 less than a year later in August of 2017. (ER33, ER39, ER263). This irregularity, in itself, merits a closer look by a jury, which could reasonably interpret this sudden drop as the product of a highly subjective and unfair paper trail designed to mask retaliatory purpose. In *Winarto v. Toshiba America Electronics Components, Inc.*, 274 F.3d 1276, 1285-86 (9th Cir 2001), the Ninth

Circuit affirmed the jury's finding of retaliation where it was disputed whether a decline in the plaintiff's performance ratings was caused by retaliation or by an actual decline in performance. *See also Ross v. Campbell Soup Co.*, 237 F3d 701, 708 (6th Cir. 2001) (sudden drop in performance evaluations evidence of pretext); *Butler v. City of Prairie Vill.*, 172 F3d 736, 752 (10th Cir. 1999) (decline in work evaluations within months of protected activity is evidence of pretext).

Finally, PPG shifted its rationale for firing Lawson by adding another justification during his termination session—falsifying his training roster. That rationale was particularly weak because, as noted above, the training roster software on Lawson's company-issued tablet had been malfunctioning. (ER189). Yet, Moore intentionally failed to mention that fact during Lawson's termination meeting, despite Lawson's pleas for assistance. (ER279-80).

PPG's assertion that Lawson falsified his training roster is itself suggestive of an improper motive. In *Despain v. BNSR Ry. Co.*, No. CV-15-08294, 2018 U.S. Dist. LEXIS 95518 (D. Ariz. Feb. 20, 2018), the company argued that the employee was lying about his protected activity, and that the employee's dishonesty gave the company cause to fire him. *See id.* at *21. The court noted that "[t]he weakness of BNSF Railway's assertion of dishonesty suggests it may be pretext for something else." *Id.* at *22. Here, as well, the weakness of PPG's assertion that Lawson falsified his training roster suggests that PPG was

manufacturing reasons to terminate Lawson, when in fact it was in retaliation for his reporting of Moore.

**B.** **PPG cannot show by clear and convincing evidence that it would have fired Lawson in the absence of his protected activity.**

PPG's stated reason for putting Lawson on a PIP was inherently suspicious, and it has not produced clear and convincing evidence that it would have fired Lawson even had he not reported Moore's unethical directives. Moore claimed that Lawson was placed on a PIP due to "missing sales goals," but PPG's HR manager later admitted that PPG has no such policy. (ER192-93). This fact further demonstrates that the PIP was merely pretext to pave the way for Lawson's eventual firing.

The remaining rationale that PPG gave for firing Lawson—fraudulent training records—is also a disputed issue of fact. PPG has not produced any evidence sufficient to prove that Lawson intentionally falsified his training roster, and the main proponent of this allegation—Clarence Moore—has a history of misleading or false testimony, as shown through his steadfast refusal to admit to his unethical directives to mis-tint paint. (ER173).

**C.** **The District Court Failed to Construe All Reasonably Disputed Inferences in Favor of Lawson, Weighed the Evidence on Disputed Facts, Improperly Made Credibility Determinations, and Applied an Overly Burdensome Standard in Reviewing Circumstantial Evidence**

**1.** **The District Court's curious standard for evaluation of circumstantial evidence**

Even if a *McDonnell Douglas* analysis requiring a demonstration of pretext were appropriate to decide Lawson's Section 1102.5 retaliation claims—which it clearly is not—the District Court also erred in applying an overly burdensome standard regarding Lawson's circumstantial evidence of pretext and in failing to construe all reasonably disputed inferences in favor of Lawson, the non-moving party. (ER1-14). When the District Court analyzed Lawson's evidence, it held that purely circumstantial evidence "must also be 'specific and substantial' to survive summary judgment." (ER7). However, that is an incorrect statement of the law. As this Court noted in *France v. Johnson*, No. 13-15534, 2015 U.S. App. LEXIS 13487 (9th Cir. Aug. 3, 2015), the U.S. Supreme Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003), requires that direct and circumstantial evidence be treated in the same manner. *France*, 2015 U.S. App. LEXIS 13487 at *14. This Court further emphasized in *France* that it has "repeatedly held that it should not take much for a plaintiff in a discrimination case to overcome a summary judgment motion." *See id.* Therefore, the District Court's treatment of Lawson's circumstantial evidence constitutes reversible error.

When all of Lawson's circumstantial evidence is considered as a whole—
including the timing of the PIP, Moore's failure to follow PPG policy and related
irregularities in administering the PIP and in grading the market walks, and the
additional rationale of supposedly falsified training rosters—Lawson has produced
more than sufficient evidence of pretext to survive summary judgment. *See Diaz v.
Eagle Produce, Ltd.*, 521 F.3d 1201, 1214 (9th Cir. 2008) (deviation from
established policies or practices is evidence of pretext that precludes summary
judgment); *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1170 (9th Cir. 2007) (pretext can
be proven by showing that the employer's proffered explanation is 'unworthy of
credence' because it is internally inconsistent or otherwise not believable).

2.     **The District Court's weighing of the evidence on disputed facts revealed
       in oral argument**

The Ninth Circuit adheres to the following standards for deciding motions
for summary judgment: "[A]t this stage of the litigation, the judge does not weigh
disputed evidence with respect to a disputed material fact. Nor does the judge
make credibility determinations with respect to statements made in affidavits,
answers to interrogatories, admissions, or depositions. These determinations are
within the province of the factfinder at trial." *Dominguez-Curry v. Nelson v. City of
Davis,* 571 F.3d 924, 928 (9th Cir. 2009)(citing *Nevada Transp. Dept*, 424 F.3d
1027, 1036 (9th Cir. 2005)). The District Court failed to follow these basic
standards, and its statements during oral argument on summary judgment further

reveal its fundamental misapprehension of the appropriate application of the summary judgment standard. The Court's treatment of Moore's suspect market walk scores as dispositive of summary judgment is perhaps the most striking example of its weighing of the evidence and its failure to construe all reasonable inferences in favor of Lawson, especially on matters turning on the credibility of Moore, a heavily compromised witness:

> THE COURT: I accept that as undisputed. That's a very strong portion of your case. I have a question on that, though. It got me to thinking. If someone becomes a legitimate whistleblower, I think the defense for the purpose of this summary judgment is not contesting, as you have just suggested, they are not contesting. Does that mean the person is unfireable despite poor performance? That's what I come down to.

> MR. HOROWITZ: Your Honor, respectfully, I think we're asking the wrong question. I mean, that's the question that the jury has to figure out. I think it's inappropriate for summary judgment.

(ER595).

***

> THE COURT: If I were to ask the defendant -- I'll ask the defendant.

> THE COURT: Do you think once you have an inadequate performance review, there is no whistleblower protection for you?

> MS. COGBILL: No, Your Honor. You will -- if you are a whistleblower, you are entitled to protection. However, it does not override your poor performance and the company's ability to manage and discipline poor performance.

> THE COURT: Yeah. Go ahead.

> MR. HOROWITZ: I agree with everything Ms. Cogbill just said. The issue is that the analysis of pretext can't end at his performance reviews that were before his whistle-blowing. If we compare those reviews to the reviews that followed, they became much, much worse. There's no other explanation for

that that has been offered by anybody as to what changed. Remember, this is a guy who had a score of 92 a few months earlier on his market walk. Got the highest one in the country. Got an award. I will also note on his August market walk the one that was a 40, PPG had a rubric that if -- that the market walk -- they've been -- it's attached to both parties' brief. A very detailed spreadsheet that has rubrics of points for each thing. The regional manager has to fill it in. Mr. Moore utilized every form of discretion that he could on the August market walk to make it as low as possible in ways that he didn't on the earlier market walks. If you just read it, it looks like it wasn't a fair assessment. He -- he -- he has one force-out, which means that he forgot to clock out of store before leaving. He gets docked five points. The rubric says if there are more than three force-outs -- three or more force-outs in the relevant time period, then you get docked points. Mr. Moore elected to dock him for one force-out. There are other similar things like that that, quite frankly, in summary judgment is difficult to sort through. It's the kind of thing that is going to require detailed witness testimony.

(ER599).

***

MR. HOROWITZ: Yeah. I mean, I think I'll sum up. This case is -- all these issues I'm talking about are credibility issues. Your Honor stated --

***

THE COURT: Wait. Is there any dispute that there were poor evaluations before the whistle-blowing? That's not a credibility issue. That's undisputed.

MR. HOROWITZ: No.

***

MR. HOROWITZ: It is not disputed. Look, his reviews are numerical. They are what they say. We cannot dispute that. The effect of them, whether they are circumstantial evidence that his later reviews were not pre- textual, is an inferential issue. All reasonable disputed inferences need to be construed in our favor in summary judgment. That comes down to credibility.

(ER600).

In essence, the Court was repeatedly asking whether a reasonable inference

could be drawn in favor of the moving party on summary judgment based almost

36

entirely upon the presumed integrity of Moore's PIP and his market walk scoring of Lawson. The mere presence, however, of possible inferences favoring the moving party does not entitle that party to summary judgment. Rather, it underscores the presence of disputed factual issues in the case involving credibility determinations that need to be resolved by a jury.

3.     **The District Court's further improper weighing of conflicting evidence and credibility determinations**

Consistent with its focus in oral argument, the District Court accepted at face value Moore's market walk scoring of Lawson and Moore's PIP for Lawson, despite Moore's obvious credibility issues. The District court ignored the fact that Moore continued to refuse to admit his wrongdoing at his deposition, contravening the internal investigators conclusions otherwise after interviewing all of Moore's territory managers:

> Q. Do you -- do you still maintain today that you did not direct your territory managers to mis-tint the paint?

> A. I do.

(ER173).

Moore's testimony, belied by fourteen neutral witnesses, is inherently incredible. A reasonable jury could *completely disbelieve* all statements by Moore and the content of documents generated by him based on his malfeasance in the mis-tinting scheme and evident perjury at his deposition. Because PPG's motion

heavily relied on Moore's testimony and documents generated by him (e.g., the Market Walks and the PIP), the District Court should have, but failed to take into account the strong possibility that he would be disbelieved by a jury at trial, and instead granted summary judgment. The District Court's decision was replete with credibility determinations favoring Moore over Lawson.

For example, the Court accepted at face value Moore's reasons for placing Lawson on a performance improvement plan and Moore's contention that Lawson failed to meet his expectations. (ER2) ("This, along with Plaintiff's Market Walk Scores, caused Plaintiff to be placed on a Performance Improvement Plan…"). The opinion states that "Plaintiff failed" to get a passing market walk score, not that Moore failed to give him one. *Id*. The Court also believed Moore's claim to have supported extending Lawson's PIP and the resulting inference that he was trying to help Lawson succeed, instead of considering the other possible inference that Moore extended Lawson's PIP because he felt that he had not yet adequately created a paper trail to support a retaliatory firing. (ER2-3). The mere presence, however, of possible inferences favoring the moving party does not entitle that party to summary judgment.

The Court also improperly weighed conflicting evidence instead of taking all evidence in the light most favorable to Lawson by accepting and focusing on evidence that Lawson received some "marginal" scores on market walks

immediately before his protected activity and discounting the fact that Lawson received the highest market walk score in the nation the prior year. (ER8). The Court similarly made no effort to reconcile Lawson's market walk scores with the fact that Moore gave him a performance review on March 2, 2017 (shortly before Lawson's protected activity) with an overall rating of "successful". (ER88-99).

The Court further accepted a disputed fact offered by Defendant that the investigation into the mis-tinting scheme resulted in Moore receiving a warning about his actions. (ER4). This ignored facts offered by Lawson (that PPG did not dispute) that tended to show PPG's support of Moore and willingness to allow him to retaliate against Lawson: that Moore's "warning" did not even mention the mis-tinting scheme and that Moore was rewarded shortly afterwards with a job offer in another division while the rest of PPG's Lowe's team lost their jobs as a result of Lowe's severing its relationship with PPG. (ER38).

The Court also invented a new obstacle that employees must overcome to defeat summary judgment. In the Court's stated view, it is not sufficient for a plaintiff to show internal inconsistencies in the employer's proffered reason to show pretext, but rather the inconsistencies themselves must have been outcome-determinative for the employee. (ER8). Lawson presented significant evidence that Moore did not score his market walks in a manner that was fair, honest, and consistent with PPG's normal practices. *Id*. Because the question whether an

employer's proffered reason is true is by definition a question of believability, it is unnecessary for the employee to discredit *all* of the facts behind the proffered reason in order to defeat summary judgment. *Burch v. Regents of the Univ. of Ca.*, 433 F. Supp. 2d 1110, 1129-30 (E.D. Ca. 2006) (citing *Dominguez-Curry v. Nev. Transp. Dept.*, 424 F.3d 1027, 1037 (9th Cir. 2005)).

Similarly, the Court assumed that PPG does not normally follow its own policies and practices, despite the lack of any record evidence supporting this assumption, and improperly placed the burden on Lawson to show that PPG normally follows its own policies. (ER8). While the Court cites *Diaz v. Eagle Produce, Ltd.*, 521 F.3d 1201, 1214 (9th Cir. 2008) for the proposition that a plaintiff has the burden of proving deviation from an established policy or practice to show pretext, *Diaz* makes no such pronouncement. Rather, this Court in *Diaz* found that the employer's failure to follow a policy contained in its employee handbook was evidence of pretext without any showing that the employer normally abided by the policy. The fact that an employer policy exists creates a presumption that the policy is followed.

Finally, the Court entirely omitted to address evidence offered by Lawson that Moore fabricated one of the main reasons for Lawson's firing—his allegation that Lawson "falsified" his training roster, an electronic document listing when Lawson trained particular sales associates in each store. Moore observed

typographical errors in Lawson's roster, and leapt to the conclusion that Lawson intentionally falsified his roster—despite having contacted PPG's IT department a few weeks earlier because of a problem with the training roster application on Lawson's company-issued tablet that was preventing Lawson from updating his roster. (ER280-82). This type of inconsistency demonstrates an irrationally strong drive by Moore to fire Lawson, which is suspicious given that Lawson had recently reported Moore for directing his subordinates to engage in fraud.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be reversed, and the case should be remanded for trial on Lawson's retaliation and wrongful termination claims.


Date: November 20, 2019

*/s/Bruce. C. Fox, Esq.*
Bruce C. Fox
bruce.fox@obermayer.com
Andrew J. Horowitz
andrew.horowitz@obermayer.com
Obermayer Rebmann Maxwell &
Hippel LLP
BNY Mellon Center, Suite 5240
500 Grant Street
Pittsburgh, PA 15219
Tel:  (412) 566-1500

Patrick Leo McGuigan
plmcguigan@hkm.com

HKM Employment Attorneys LLP
453 S. Spring Street, Suite 1008
Los Angeles, CA 90013
Tel:    (213) 259-9950

*Attorneys for Appellant*
*Wallen Lawson*

## STATEMENT OF RELATED CASES

Appellant does is not aware of any related case pending in the Ninth Circuit.

Date: November 20, 2019

*/s/Bruce C. Fox, Esq.*
Bruce C. Fox

*Attorney for Appellant*
*Wallen Lawson*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9688 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2010, Times New Roman 14-point font.

Date: November 20, 2019

*/s/Bruce C. Fox, Esquire*
Bruce C. Fox

# CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of November 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: November 20, 2019

*/s/Bruce C. Fox, Esq.*
Bruce C. Fox

# ADDENDUM

**California Labor Code § 1102.5.**

(a) An employer, or any person acting on behalf of the employer, shall not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance, or from providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

(b) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

(c) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

(d) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for having exercised his or her rights under subdivision (a), (b), or (c) in any former employment.

(e) A report made by an employee of a government agency to his or her employer is a disclosure of information to a government or law enforcement agency pursuant to subdivisions (a) and (b).

(f) In addition to other penalties, an employer that is a corporation or limited liability company is liable for a civil penalty not exceeding ten thousand dollars ($10,000) for each violation of this section.

(g) This section does not apply to rules, regulations, or policies that implement, or to actions by employers against employees who violate, the confidentiality of the lawyer-client privilege of Article 3 (commencing with Section 950) of, or the physician-patient privilege of Article 6 (commencing with Section 990) of, Chapter 4 of Division 8 of the Evidence Code, or trade secret information.

(h) An employer, or a person acting on behalf of the employer, shall not retaliate against an employee because the employee is a family member of a person who has, or is perceived to have, engaged in any acts protected by this section.

(i) For purposes of this section, "employer" or "a person acting on behalf of the employer" includes, but is not limited to, a client employer as defined in paragraph (1) of subdivision (a) of Section 2810.3 and an employer listed in subdivision (b) of Section 6400.

(Amended by Stats. 2015, Ch. 792, Sec. 2. (AB 1509) Effective January 1, 2016).

## California Labor Code § 1102. 6.

In a civil action or administrative proceeding brought pursuant to Section 1102.5, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5.

(Added by Stats. 2003, Ch. 484, Sec. 3. Effective January 1, 2004).